[Cite as *In re C.A.P.*, 2026-Ohio-662.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

IN THE MATTER OF:

C.A.P., DEPENDENT CHILD

**CASE NO. 2025-P-0075**

Civil Appeal from the
Court of Common Pleas,
Juvenile Division

Trial Court No. 2022 JCC 00599

## OPINION AND JUDGMENT ENTRY

Decided: February 26, 2026
Judgment: Affirmed

*Matthew S. Ziccarelli,* Ziccarelli Law, 8754 Mentor Avenue, Mentor, OH 44060 (For Appellant, Debra Wymer).

*Connie J. Lewandowski,* Portage County Prosecutor, *Holly M. Spohn*, and *Brandon J. Wheeler*, Assistant Prosecutors, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee, Portage County Department of Job and Family Services).

*Karlek D.D. Jarvis*, 206 South Meridian Street, Suite A, Ravenna, OH 44266 (Guardian ad litem for Father, Michael Petit).

*Rebecca R. Grabski*, Bret Jordan Co., L.P.A., 206 South Meridian Street, Suite A, Ravenna, OH 44266 (Guardian ad litem for minor, C.A.P.).

*Thomas Grist*, 114 Barrington Town Square Drive, 342, Aurora, OH 44202 (Guardian ad litem for Appellant).

ROBERT J. PATTON, J.

{¶1} Appellant, Debra Wymer ("Mother"), appeals the decision of the Portage County Court of Common Pleas, Juvenile Division, granting permanent custody of minor

child "C.P." to Portage County Jobs and Family Services ("PCJFS"). For the following reasons, we affirm.

{¶2} Mother presents a single assignment of error for review. Mother asserts that the trial court abused its discretion when it evaluated the factors of R.C. 2151.414(D)(1) and granted permanent custody to PCJFS. Upon review of the record in this case, we conclude that the trial court's best-interest analysis and judgment is consistent with the manifest weight of the evidence.

{¶3} Accordingly, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

**Substantive and Procedural Facts**

{¶4} Mother and Michael Petit ("Father") are the biological parents of minor child, C.P. On November 8, 2022, PCJFS filed a verified complaint for temporary custody of C.P. after receiving reports that the child was being locked in her room, had not been to a medical doctor, was not enrolled in school, and had very little interaction with her parents. A guardian ad litem ("GAL"), Rebecca Grabski ("Grabski"), was appointed for C.P. on November 9, 2022.

{¶5} A civil pretrial was held on November 23, 2022. After the hearing, C.P. remained in legal custody of the parents with an order of protective supervision. An adjudicatory hearing was held on December 22, 2022. Both parties were present at the hearing. C.P. was adjudicated dependent pursuant to R.C. 2151.04. A dispositional hearing was held on January 19, 2023. At the hearing, the court adopted the case plan previously filed with the court, and legal custody continued with Mother and Father with

an order of protective supervision. On January 12, 2023, the GAL filed a report with the court below.

{¶6} On August 14, 2023, PCJFS filed a motion to modify disposition. A hearing was held on the motion on September 7, 2023, and the motion was granted. The same day, C.P. was removed from Mother's and Father's home and placed in temporary custody of PCJFS.

{¶7} On October 20, 2023, PCJFS filed a motion to extend temporary custody. An annual review hearing and hearing on the motion for extension of temporary custody was held on October 26, 2023. The motion to extend temporary custody was granted.

{¶8} On December 11, 2023, Mother filed a motion for legal custody of C.P. On January 4, 2024, Father filed a motion for legal custody of C.P. A status review and hearings on both motions for legal custody were held on January 18, 2024. Both Mother and Father's motions for legal custody were denied and C.P. continued in temporary custody of PCJFS.

{¶9} On March 7, 2024, PCFJS filed its second motion to extend temporary custody of C.P. On April 9, 2024, a hearing on PCJFS's second motion to extend temporary custody was held and PCJFS's motion was granted. A status review hearing was held on July 2, 2024. At the hearing, attorneys for both Mother and Father filed motions for the appointment of a GAL for both of their clients. Mother and Father's motions for the appointment of a GAL were granted the same day. On July 3, 2024, Attorney Karlek Jarvis was appointed GAL for Father, and attorney Thomas Grist was appointed GAL for Mother.

Case No. 2025-P-0075

{¶10} On October 4, 2024, PCJFS filed a motion for permanent custody of C.P. On October 28, 2024, Mother filed a motion for legal custody. On November 8, 2024, Father filed a motion for legal custody. On January 23, 2025, Grabski filed a GAL report. Hearings were held on PCJFS's motion for permanent custody, and both Mother's and Father's motions for legal custody on January 29, 2025 and April 29, 2025. The following facts were presented at the hearings:

{¶11} At the January 29, 2025 hearing, Janie Rodkey ("Rodkey"), former employee of PCJFS and a case worker assigned to C.P.'s family from November 2022 to September 2024, testified. Rodkey explained that the PCJFS became involved after reports were received alleging that C.P. was being locked in her room, that she was not enrolled in school, that she had not seen a doctor, and that she was getting very little interaction at home. Rodkey testified that she drafted a case plan after C.P. was adjudicated dependent at the December 22, 2022 hearing. The case plan was filed with the trial court on December 22, 2022. In addition to the case plan, a safety plan was created with the family on July 7, 2023. Rodkey explained that the safety plan was a "voluntary agreement between the parents and the agency to minimize safety concerns."

{¶12} Rodkey indicated that Mother and Father "engaged in case plan services shortly after the adjudication hearing." Rodkey testified that she visited the family home with her supervisor after learning that C.P. had broken her arm which required emergency surgery to place a pin in C.P.'s elbow.[1] Rodkey stated, "we found the home to be deplorable. There were nails and equipment, tools found spread throughout the house because they were doing a – they were fixing their steps going up to their trailer. We

---

1. Rodkey testified that she received multiple stories from the parents as to how C.P. broke her arm.

Case No. 2025-P-0075

found [C.P.] to be locked back in her room." Rodkey testified that a main concern of the agency were Mother and Father's use of baby gates, "we found two baby gates stacked on top of each other. [C.P.] was laying on subflooring. There was food spread out throughout her room. Her hair was matted." Rodkey stated that C.P. could not get into the bathroom, and that there was lumber laying everywhere around the house. Rodkey testified that Mother and Father were "using zip ties to keep [C.P.'s] clothes together and duct tape on her diapers." After the visit, Rodkey told Mother and Father that "that [C.P.] could not stay at this house at this time and that she needed to leave." C.P. was then placed in the care of her maternal grandparents. Mother and Father were permitted to have supervised visits with C.P.

{¶13} After being placed in the care of the maternal grandparents, Rodkey testified that "[C.P.] still had not been enrolled in a school, and [C.P.] had some needs that needed to be taken care of. [C.P.] was nonverbal at the time, and she was very behind for her age." Rodkey said that C.P. was five at the time. According to Rodkey, C.P. was later removed from the maternal grandparents' home and placed into foster care in November 2023 when it was discovered that they had permitted Mother and Father unsupervised time with C.P.

{¶14} Rodkey testified to the trial court that Mother's case plan objectives were to "get a mental health assessment, to get a parenting assessment and to maintain basic needs" and maintain a clean house. Rodkey stated Mother was either engaged in the case-plan services or had completed her case-plan objectives when Rodkey's employment with PCJFS ended. After Mother had completed parenting classes as part of her case-plan objectives, Rodkey observed C.P. in the home with Mother. According

Case No. 2025-P-0075

to Rodkey, after the child did not know her name, Mother would "physically handle" C.P. when attempting to redirect her, by "pulling her."

{¶15} Rodkey stated that Father's case-plan objectives were the same, though he had not completed his objectives by the time she left PCJFS. Rodkey testified that Father "never parented her, whether it was in a home visit while she was in the home or our visits while I was visiting them after she was removed. He didn't pay much attention to her . . . ."

{¶16} During her employment at PCJFS, Rodkey stated that neither Mother nor Father were able to achieve their goals of addressing concerns identified to safely parent C.P. Rodkey testified that Mother and Father "completed their parenting classes at Ever Well, and it was clear that it did not translate. The parenting classes were not intensive enough to allow them to effectively parent . . . ." Rodkey explained that Ever Well is a ten-week parenting class that takes place at the parent's home. Rodkey stated that after Mother and Father completed the Ever Well parenting classes, they were still unable to provide appropriate food for C.P., and that the parents "had a confusion about her being lactose intolerant. We kept having to correct them what that meant . . . they didn't understand that [C.P.] couldn't drink milk."

{¶17} Rodkey testified that both parents also completed Lighthouse assessments resulting in a recommendation that C.P. should not reunify with her parents. The parents were referred to a more intensive parenting program through Goodwill Parenting in "May or June of '24."

{¶18} According to Rodkey, she observed 15 to 20 visits with C.P. and her parents. "[Mother] did most of the parenting . . . . She did try very hard, and she could do

Case No. 2025-P-0075

the things if we directed her do so. If we told her that [C.P.] needed to eat and she needed to eat at this certain time, she would do that, but it was after having direction to do that. [Father] would interact with [C.P.], but he would become very - - like if [C.P.] lost interest he would also lose interest, and he would be seen either playing by himself or he would be interacting with us more than [C.P.]. They had a very hard time trying to build more interaction with [C.P.] than other like baseline just like reading a book and whatnot."

{¶19} Rodkey testified that based on her observations of the visits, the parents and C.P. did not seem to have significant bonds with one another. Rodkey stated that C.P. would get overwhelmed during visits and ask to leave, and that she seemed more bonded with her foster mom. Rodkey testified that C.P. was very sick when initially placed in a foster home and spent "probably a month" in the hospital. She explained that C.P. had been drinking milk from a sippy cup, despite her lactose intolerance, combined with baby cereal. The combination damaged C.P.'s teeth. "[S]he went into the hospital twice, and she had to have emergency surgery. She was diagnosed with corona virus, rhino virus, Covid and then she had pneumonia, and they had to physically go there and like relieve her lungs because her body could not fight it off. She then had to go see like a specialist after that."

{¶20} Rodkey stated that after being placed in foster care C.P. was brought up to date on medical vaccinations. Additionally, C.P.'s foster mother spent time with C.P. teaching her to learn her name, learn words, and simple motor skills. Rodkey testified that she believed C.P. to have a significant bond with her foster parents.

{¶21} Rodkey testified that to her knowledge, Mother was diagnosed with bipolar disorder and Father has had a traumatic brain injury and a partial lobotomy. Rodkey

Case No. 2025-P-0075

testified that while the parents were allowed more visitation after C.P. was removed from the home, they only came to visit her once a week.

{¶22} Dr. Aimee Thomas ("Dr. Thomas"), a licensed psychologist and professional clinical counselor, also testified at the January 29, 2025, hearing. Dr. Thomas explained that she works for Lighthouse Family Center where Mother and Father participated in services. Dr. Thomas testified that she created the company in 2018, providing "various services, individual counseling, family counseling[,] as well as evaluations including parenting evaluations." Dr. Thomas explained that she conducts evaluations for Jobs and Family Services, domestic relations court, and juvenile court.

{¶23} Dr. Thomas testified that she has conducted over three thousand parenting evaluations. Dr. Thomas explained that a parenting evaluation is "a psychological evaluation with a lens towards parenting so that includes looking at any factor of a person's life that impacts their ability to raise their children competently." Those factors could include "anything from housing, employment, mental health, substance abuse, support systems, romantic partners, looking at how they were raised." The goal of the parenting evaluations "is to create a case plan with the goal of reunification for people involved with child protective services."

{¶24} Dr. Thomas explained the evaluations are conducted in person, and recommendations are formulated "based on all the data [the participants] provided, the psychological testing as well as integrating collateral data from children's services or other agencies." Dr. Thomas testified that she conducted parenting evaluations of both Mother and Father.

{¶25} Dr. Thomas testified that she evaluated Mother first, at the request of PCJFS, on February 29, 2024, April 4, 2024, and April 11, 2024. Dr. Thomas prepared a report as a result of her evaluation (Exhibit F). Dr. Thomas said she considered data from "child protective services in Portage County as well as Ever Well, a treatment provider that was providing individual counseling and parenting skill training" in creating her report. Dr. Thomas administered the Kaufman Brief Intelligence Test, second addition; the Kaufman Brief Academic Test, the Millon Clinical Multiaxial inventory, a structured clinical interview for DSM-V disorders, a parenting stress index and a substance abuse screening inventory.

{¶26} On the Kaufman Brief Intelligence Test, Dr. Thomas testified that Mother's results indicated that Mother is "functioning within the lower . . . of intellectual ability." Specifically, Mother received a verbal IQ of 71, a nonverbal IQ of 57, and a full scale IQ of 63. Dr. Thomas explained that Mother was functioning "at the level of an 11-year old in terms of verbal skills. That's the level of a five-year old with regard to nonverbal skills." Dr. Thomas further elucidated that "when we look at nonverbal skills this is reflecting an individual's ability to use good judgment or reasoning, their ability to learn parenting instruction and then apply it to new situations particularly as their child begins to grow or mature in different settings."

{¶27} On the Kaufman Functional Academic Skills Test, which assesses "basic reading and math skills", Dr. Thomas testified that Mother earned a subtest score of 66 in arithmetic, a subtest score of 73 in reading, and a composite score of 69. Dr. Thomas explained that an average score is 100 and that Mother's scores offer "additional support of concern with that cognitive capacity." Dr. Thomas indicated that the scores impact

Case No. 2025-P-0075

Mother's ability to care for her child and safely parent in that it can affect her ability to provide prescribed medication to the child, pay her bills, budget money well, and "can affect more broad-based living experiences and [her] ability to provide a stable and consistent home environment for children."

{¶28} Dr. Thomas also administered the Millon Clinical Multiaxial Inventory which "looks at [a] multitude of mental health disorders from depression, anxiety, it looks at personality disorders so it covers – it focuses primarily on personality characteristics, but also can help assist in the diagnosis with underlying mental health disorders." Dr. Thomas testified that the test indicated a low threshold for frustration. However, the results raised a concern about Mother's cognitive ability and reading capacity and how it might impact the accuracy of the test. Based on Mother's "self-reports from the clinical interview she identified concerns with anger management as a source of concern. That was consistent with her performance to this test."

{¶29} Dr. Thomas testified that the Structured Clinical Interview raised additional concerns. "Well, this again reflects concerns with some mood dysregulation, mood swings, her highs and lows in relationships with others so this is about anger management issues, mood regulation issues and this was consistent also with her disclosures."

{¶30} Dr. Thomas also administered the Parenting Stress Index assessment and explained that the purpose is to look at factors that might create stressors for a parent. Dr. Thomas explained that the test revealed that "her daughter presented with symptoms consistent with attention deficit hyperactivity disorder and that she may also present with some minor behavioral problems and may be sad and depressed. Despite her child's characteristics and some challenges, [Mother] reported that she felt confident in her ability

to parent her child and denied experiencing any depression or emotional difficulties raising her child . . . ." Dr. Thomas testified that "there's concerns that if [Mother] sees herself as an adaptive parent that she's not going to be open to feedback when participating in parenting skill training  so when I have people who see themselves as exemplary in terms of parenting strategies, it's very difficult to then confront those issues, and that certainly was identified with [Mother] during her evaluation despite acknowledging that children services had concerns with her approach to raising her child and participating in parenting classes she did not recognize she did anything wrong, and if someone does not identify something as a problem they're not likely to change it."

{¶31} Dr. Thomas opined that Mother is unable to provide C.P. with the social interaction that she requires. Specifically, Dr. Thomas indicated that "[C.P.] was often left in her room for multiple hours during the day with very minimal interactions. [Mother] told me that [C.P.] was very active and that she could only tolerate interacting with her once an hour so . . . there were concerns about her ability to understand or meet her child's needs so the social interaction for [C.P.], basically there was minimal opportunity for this child to engage in that social stimulating interaction between parents, whether it's through play, whether it's through going for a walk and that can have profound implications for children . . . ."

{¶32} Dr. Thomas testified that based on information provided by Mother, children's services, and Ever Well, Mother had been provided "ample opportunity while [C.P.] was still in the home" to modify her approach to parenting but did not have insight into what she was doing wrong and what changes needed to be made. Dr. Thomas

Case No. 2025-P-0075

testified that despite multiple interventions, services, and programming. Mother was "unable or unwilling to make changes she really needed to competently raise a child."

{¶33} Dr. Thomas further stated, "it is very rare that I'm offering the opinion that people cannot receive enough interventions to raise their children, but it was apparent based on the cognitive capacity of both [Mother] and [Father] as well as [C.P.]'s very special needs, this was a child at the age of five was functioning at the level of an 18-month old so this is a child with profound special needs that really needed some very intensive intervention, and based on [Mother's] ability to recognize this I felt that really at this time there really wasn't much more we could do. . . ." Dr. Thomas testified that "documentation that came from the school indicated that [C.P.] made significant progress since placement with these foster parents, which would illustrate that [C.P.]'s, although she still meets the criteria for developmental disabilities, that that [sic] many of these issues were further exacerbated by neglect that occurred when under the care of [Mother] and [Father]." Dr. Thomas also states that in her opinion it would be "nearly impossible" for Mother and Father "to independently raise a child with such profound needs paired with their lack of insight so again I offer the opinion that he had met the maximum therapeutic benefits of his treatment services." Dr. Thomas further testified that her opinion is unique with regard to Mother and Father and their ability to meet the special needs of C.P. and indicated that her opinion might "possibly" be different with an individual that doesn't have C.P.'s needs.

{¶34} Amy Humrighouse ("Humrighouse"), a parenting instructor at Goodwill Industries of Canton, also testified at the January 29, 2025 hearing. Humrighouse explained that Goodwill Industries offers parenting skills training programs. According to

Humrighouse, when a participant is referred to the training program, Goodwill Industries reviews collateral information including "information from the complaint" and "a parenting assessment through a psychological" and "the case plan." After referral, "each individual does an intake private with my supervisor that talks about their case and why they're referred." Once this information is gathered, Goodwill Industries develops "program goals for each individual."

{¶35} Humrighouse further explained that each program plan addresses topics in class which are also designed to improve the areas of concern that were identified when the participant was referred to the program.

{¶36} Humrighouse testified that there are four certificate levels offered and explained that while an individual may complete the course, the individual may still be unsuccessful. According to Humrighouse, "[t]he top certificate levels are completion certificate" which means that the participant "successfully completed the majority of the course requirements." There is also a participation certificate, which is awarded upon the participant "successfully completing the average amount of course requirements." There is an attendance certificate, which means the individual completed the "minimal amount of course requirements. Finally, there is also a noncompliance certificate which indicates that the participant "is failing to complete minimal amount of course requirements."

{¶37} Humrighouse testified that Mother and Father explained to her that the pair lived together but were no longer in a romantic relationship. Humrighouse stated that Mother had a boyfriend, and Father had a girlfriend, and that they planned on moving their respective partners into the home with them and C.P.

Case No. 2025-P-0075

{¶38}  Humrighouse testified that Mother had three individual goals, which were to address her involvement with PCJFS, explain C.P.'s injuries that she sustained, explain appropriate medical attention for C.P., as well as demonstrate play time, work towards development milestones with C.P., and demonstrate ability to meet C.P.'s needs which included providing food and appropriate clothing. Mother also had 11 program goals to complete. Humrighouse testified that Mother completed all of the individual goals, but "they were not accepted because of the lack of information, vague information." Mother also completed 5 of the 11 program goals.

{¶39}  Humrighouse testified that Mother completed the Goodwill Parenting Skills Program with a noncompliant certificate on October 31, 2024. Humrighouse testified that Mother attended all of the family visits, 10 in total, during the Goodwill Parenting Program. Humrighouse testified that Mother spoke to C.P. during meals, but mostly just sat with her during playtime. Humrighouse stated that during visits there was "a level of nonengagement" and that C.P. would look around the room and was "attracted by other families having their visits." When asked about the bond between Mother and [C.P.], Humrighouse testified, "I did not recognize any hugs. I didn't see [C.P.] attached to her mom. I didn't observe anything like that." Humrighouse further indicated that "[o]verall the connectivity during the visit. Just no connection, limited. I didn't see much of a bond or an attachment between mother and child."

{¶40}  Humrighouse said that when working with Mother on a daily routine as part of her goals, "[Mother] submitted her goal and she had 10:00 in the morning she's getting ready to wake up. Breakfast for [C.P.] is at 10:30. 11 is [C.P.]'s getting potty time, getting dressed, she's playing in the living room so she had breakfast at 10:30, lunch is at 11:30,

and it's pizza rolls. 12 until 1:00 is going for a walk, going to the store. She does have a potty break for [C.P.], and [C.P.] will be playing in her room . . . . The afternoon goes into a walk. Bath time for [C.P.] is at 4:00. She takes dinner at five. After dinner it would be reading books with [C.P.], snack is at 6:30. After snack at 6:30, 7 is a lot of TV time all the way to 8:00, and that's when [C.P.] is cleaning her room. 9:00 [C.P.]'s getting ready for bed and having another bath. She had one at four and now she's having another one at nine. 10:00 is [Mother] going through her own cleaning routine." Humrighouse testified that she was not aware of any parenting programs more intensive than Goodwill, and stated that at completion of the program, she did not recommend reunification for C.P. and Mother.

{¶41} Tiffanie Goldner ("Goldner"), a PCJFS caseworker, also testified at the April 29, 2025 hearing. Goldner was assigned to work with C.P. as an assessment and investigative caseworker. Goldner testified that she investigated the initial concerns in C.P.'s case in December or January of 2022, and 2023, and again in August, September, or October of 2024 as an ongoing caseworker. Goldner testified that C.P. was four when she began working with the family.[2]

{¶42} Goldner testified that she visited the family's home October 27, 2022 and made the following observations:

> Um, so [C.P.] was in the back of the home. There was a half-door on it at the time with an eye-and-hook lock. There was a camera pointed from the hallway to the room.
>
> However, because of the shape of the room and the design of the room you weren't able to see [C.P.] properly.
>
> She was – she had feety pajamas on, but the feet were cut out and they were put on backwards. When I asked [Mother]

---

2. At the time of the hearing, C.P. was six.

about this she advised it was because she kept taking her clothes off . . . . I tried to interact with [C.P.]. She didn't speak at all. She didn't really respond in a verbal way. However, when we did go in the room she was very excited to have somebody in there with her and spending time with her. I advised the parents this was a safety risk. . . . [C.P.]'s hair was also extremely matted. It was just – I don't know how to describe it. It looked like she hadn't been bathed in a while, and it was cut very, very short. When I asked what was going on with her hair, [Mother] had stated they cut it due to issues with allowing her to wash the hair and brush the hair, etc. . . . There was also a pillow and blanket on the floor. There was no bed, no mattress of any kind and various stuffed animals around along with a television in the corner.

{¶43} Goldner testified that Father told her he had an app for the camera, but that it was not operational at the time. Goldner stated that the camera was outside of the room, "down the hall, closer to the living room than the bedroom."

{¶44} Goldner testified that after a follow-up visit on November 7, 2022, she still had concerns about the condition of the home and C.P.'s safety. Goldner testified that when she returned to the home, C.P. was locked in her bedroom again. Goldner testified "there were zip ties around her shoulders so the cloth on her shirt was bunched, and I asked [Mother] why. She advised it was to keep [C.P.] from taking her clothes off again, and I asked, you know, what the engagement level was, if it had improved, and [Mother] stated she spends time with [C.P.] for about an hour when changing her diaper." When Goldner confronted Mother about the door being locked, Mother "began yelling, screaming, swinging her arms" at Goldner, and screamed at Goldner to get out. Goldner stated that Father was present during the visit but did not interact with her. Goldner stated that she had recommended in-home services for Mother and Father, but Mother declined.

{¶45} Goldner testified that after these visits, Rodkey was assigned as the family's caseworker. However, Goldner was reassigned in September of 2024. Goldner testified

Case No. 2025-P-0075

that when she first saw C.P. "[s]he appeared to be a shell of a person. There was no real light behind her eyes. It was almost like she was just existing. She didn't get excited for things. She wasn't happy. She just was very blasé, and I don't know how to describe it. It was heartbreaking." Goldner also described what C.P. was like after being placed in foster care. Goldner testified that C.P. is now potty trained and can communicate. Goldner stated: "[C.P.] laughs, she smiles. . . . When I saw [C.P.] for the first time after a significant break, between [Rodkey] having the case and coming back to myself, I didn't recognize her. I would have never know that was [C.P.] if somebody hadn't told me."

{¶46} Goldner stated that she had recently visited Mother's and Father's home. Goldner testified that her concerns for C.P.'s safety, if she were to return to the home, remained due to the home's condition. Goldner testified that Mother and Father were unable to remedy PCJFS's concerns during the near two years that C.P. has been removed from the home, stating "[Father's] goals were not met as far as, you know, in health and safety. . .and his level of understanding is still that of what it was in the beginning of this case for the concerns for locking [C.P.] in her room, her need to see medical providers, he need to engage in services. . . ." Goldner testified that "[s]imilar to [Father,]" Mother had not remedied or gained greater understanding as to "[C.P.]'s need to engage in services. . . .The importance of not only interaction but not sequestering [C.P.] away from the family, from human interaction. You know, her need to engage and caring for her fully, completely."

{¶47} Goldner explained that during every visit with the parents she discussed what needed to be done to remedy the concerns. While the parents verbalized their understanding, the interactions suggested that the parents did not seem to understand

Case No. 2025-P-0075

[C.P.]'s needs. Goldner stated that it was hard to tell if C.P. had any bond with Mother or Father as C.P. was an affectionate child.

{¶48} Goldner also testified that C.P. "loves" her foster care environment." According to Goldner C.P. "plays with the other children in the home very well. She attends church and community activities, and. . .appears very comfortable in the home with the foster parents." Goldner testified "[C.P.] deserves stability. She deserves consistency. Because of the lack of follow-through early in her life in different respects this will now carry on for the rest of her life [C.P.] requires significant services, speech therapy. . .physical therapy. . .just a lot of things to get her even close to being on track with her peers her age, and she will need these services likely for the rest of her life. She deserves not only love but a responsibility to her that I don't believe was met before being placed in [PCJFS's] custody." Goldner stated that "I don't doubt that these parents love this child, but in C.P.'s circumstance you need more than love."

{¶49} Goldner explained that she had reviewed records regarding the termination of Mother's and Father's parental rights for C.P.'s sibling, J.W., in Stark County in 2015. Goldner also testified that PCJFS made attempts to locate family that might be able to take custody of C.P., but they were unsuccessful, stating that "[e]verybody that we did complete contact with declined." Finally, Goldner testified that she believed it to be in C.P.'s best interest to be placed into the permanent custody of PCJFS.

{¶50} Grabski, the GAL appointed for C.P., also testified. Grabski explained that she met with C.P., met with Mother and Father, observed supervised visits, and had spoken with the family's caseworkers, Rodkey and Goldner. Grabski testified that she received records from Goodwill, Dr. Thomas at Lighthouse, and had reviewed those

records. Grabski testified that the last observed visit she had with the parents and C.P. was in December 2024. Grabski testified that she did not talk to any of the school personnel, mental health providers, or medical providers for C.P. Grabski further testified that she never visited the foster residence where C.P. was placed.

{¶51} Grabski observed C.P. while in the home with the parents two times prior to C.P.'s placement in foster care. Grabski observed C.P. and the parents at the visitation center between five and ten times. Grabski also testified that she believed it to be in C.P.'s best interest to be placed in the permanent custody of PCJFS.

{¶52} On May 13, 2025, a magistrate's decision was filed granting permanent custody to PCJFS. The trial court adopted the magistrate's decision on May 14, 2025. Objections to the magistrate's decision were filed by Father and Mother on May 22, 2025, and May 23, 2025, respectively.

{¶53} On July 23, 2025, Grabski filed a GAL report. On July 31, 2025, both Mother and Father, through counsel, filed motions requesting extensions of time to file supplements to their objections. The motions were granted on August 1, 2025. On August 7, 2025, Mother and Father each filed their memorandum in support of objections to the magistrate's decision. On August 15, 2025, PCJFS filed its response to Mother and Father's supplemental objections.

{¶54} On September 26, 2025, the trial court overruled Mother and Father's objections to the magistrate's decision and subsequently adopted the decision to terminate their parental rights. The trial court noted that Mother and Father specifically objected to the introduction of the GAL's report and testimony; and offered "only generalized" objections to the decision on the grounds that it was against the manifest

weight of the evidence and contrary to the child's best interest. The trial court concluded that the GAL's January 23, 2025 report "failed to comport with the requirements of Loc.R.26.06(H) and Sup.R. 48.06(A) as it only consisted of a single, four-sentence paragraph" and "fell below the minimum standard." However, the trial court found "no error" in the Magistrate's decision despite the obvious deficiencies of the GAL report. The trial court noted that the magistrate referenced the GAL report a single time regarding his findings under R.C. 2151.414(D)(1)(b) and that such reference revealed "that the [GAL] report and/or testimony had an extremely minimal effect, if any, on the Magistrate's ultimate conclusion." Furthermore, the court below found that neither Mother nor Father suffered any prejudice from the filing of the GAL report or from the testimony of the GAL. Indeed, the trial court found "the record ripe with competent, credible evidence to support the Magistrate's decision to grant permanent custody of [C.P.] to PCJFS even in the absence of the [GAL]'s report, testimony, and recommendation."

{¶55} The trial court also determined that Mother and Father's "generalized" objections to the magistrate's decision regarding the manifest weight of the evidence and the determination of the child's best interest, were not well taken as they failed to specifically state with particularly the grounds for the objections and failed to comply with the requirements of Juv.R.40. The court below further determined that the magistrate conducted a "comprehensive and thorough review of the evidence and testimony" and the decision was "well-supported with evidence that supports the award of permanent custody to PCJFS."

{¶56} Mother timely filed her notice of appeal on October 29, 2025.[3]

---

3. Father also appealed from the trial court's judgment in Case No. 2025-P-0073.

## The Appeal

{¶57} Mother presents a single assignment of error for review: "[t]he trial court committed an abuse of discretion when granting Portage County Department of Jobs and Family Services permanent custody of the minor child.

## Manifest Weight/Sufficiency

{¶58} "Termination of parental rights has been described as 'the family law equivalent of the death penalty.'" *In re Hoffman*, 2002-Ohio-5368, ¶ 14, quoting *In re Smith*, 77 Ohio App.3d 1 (1991). However, "[t]he rights of a parent to his or her child, while fundamental, 'are always subject to the ultimate welfare of the child.'" *In re. L.M.R.*, 2017-Ohio-158, ¶ 33, quoting *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979). "[T]he termination of the rights of a natural parent should occur as a last resort . . . when necessary for the welfare of the child." *Id.*

{¶59} The Supreme Court of Ohio recently clarified the appellate court's standard of review for permanent custody cases under R.C. 2151.414 in *In re Z.C.*, 2023-Ohio-4703. In that case, the Court observed:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.
>
>  . . .
>
> Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, . . . 2012-Ohio-2179, . . .¶ 10, quoting *State v. Thompkins*, 78 Ohio

St.3d 380 . . . (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on its effect in inducing belief'" (emphasis sic), *id*. at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"" *Bryan-Wollman v. Domonko*, . . . 2007-Ohio4918 . . ., ¶ 3, quoting *Thompkins* at 386, quoting Black's at 1433.

But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 11, 13-14.

{¶60} In Mother's sole assignment of error, she alleges that the trial court abused its discretion when it concluded that terminating parental rights was in the best interest of C.P. We disagree.

{¶61} Before granting permanent custody to PCJFS, R.C. 2151.414 requires that two prongs are met: "(1) that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) is present and (2) that it is in the best interest of the child to grant permanent custody to the agency moving for custody. R.C. 2151.414(B)(1)." *In re G.C.M.G.*, 2023-Ohio-3018, ¶ 24 (11th Dist.).

{¶62} R.C. 2151.414(B)(1)(a) through (e) provides:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from shoe custody the child has been removed has been adjudicated an abused, neglected, or dependent child

Case No. 2025-P-0075

on three separate occasions by any court in this state or another state.

{¶63} If at least one of the circumstances in R.C. 2151.414(B)(1)(a) through (e) exists, the court must then determine by clear and convincing evidence that granting permanent custody is within the child's best interests. Here, the trial court determined that R.C. 2151.414(B)(1)(d) applied because C.P. was in the temporary custody of PCJFS for 12 or more months of a consecutive 22-month period. Mother does not dispute this finding. Thus, the first prong pursuant to R.C. 2151.414(B) was met, and the trial court was then tasked with determining by clear and convincing evidence that granting permanent custody is within the child's best interests.

{¶64} R.C. 2151.414(D)(1) requires that the trial court, in determining the best interest of the child, must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶65} As this court has noted, "[d]etermining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "'all relevant [best interest] factors,'" as well as the 'five enumerated statutory factors.'" *In re B.R.H.*, 2025-Ohio-5181, ¶ 38 (11th Dist.) quoting *In re C.F.*, 2007-Ohio-1104, at ¶ 57, quoting R.C. 2151.414(D).

{¶66} R.C. 2151.414 does not require a court to give any of the best interest factors "greater weight or heightened significance." *Id.*, quoting *In re C.F.* at ¶ 57. When making its best interest determination, a trial court must consider the totality of the circumstances. *Id.* "In general, '[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security.'" *Id.,* quoting *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.).

{¶67} Mother objected to the magistrate's decision. The trial court indicated that Mother's generalized objection to the magistrate's decision did not state the grounds for the objection with particularity. Despite this conclusion, the trial court considered the generalized objections on the merits and subsequently determined that it was in the best interest of the child to award permanent custody to PCJFS.

{¶68} On appeal, Mother cites to each of the five enumerated factors in R.C. 2151.414(D)(1)(a)-(e). From the arguments in Mother's brief to this court, it appears that Mother takes issue with the trial court's determination as to factors (a) and (d).

Case No. 2025-P-0075

{¶69} In regard to R.C. 2151.414.(D)(1)(a), the interaction and interrelationship of C.P. with her parents, siblings, relatives, foster caregivers, and out-of-home providers, the trial court determined that C.P. "exhibited at least a minimum bond" with Father, "had no true bond with Mother," and was not bonded to any sibling. The trial court also concluded that C.P. was bonded with her current foster family. The trial court noted that C.P. had, since her placement with the foster family, began to meet "important developmental milestones."

{¶70} Mother contends that the evidence presented contradicts the trial court's finding that there was no true bond between Mother and C.P. We disagree. While Ms. Goldner indicated that C.P. was excited to see Mother, she also testified that it was hard to say if a bond existed because C.P. was an affectionate child. Mother also asserts that the trial court did not address whether the child had a relationship with the maternal grandparents. However, there was evidence in the record that C.P. was initially placed with the maternal grandparents, but removed due to noncompliance with the safety plan.

{¶71} Mother does not dispute the trial court's decision regarding R.C. 2151.414.(D)(1)(b), the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. The trial court noted that C.P. was six years old at the time of the permanent custody hearings and "not of sufficient age or maturity to express her wishes or concerns." At the time of removal, C.P. was four, nonverbal, did not know her name, and had not been enrolled in school. C.P. had been diagnosed with autism and could only talk in "short-word sentences." The trial court acknowledged that the GAL had recommended permanent custody but noted

Case No. 2025-P-0075

that such recommendation was just one factor a trial court considers in determining if permanent placement is in the best interest of the child.

{¶72} Mother also does not dispute the trial court's findings regarding the custodial history of the child, as enumerated in R.C. 2151.414.(D)(1)(c). The trial court correctly noted that C.P. was removed from the home and placed in the temporary custody of PCJFS on September 8, 2023. The court concluded that C.P. had been in the custody of PCJFS in excess of 12 of the past 22 consecutive months.

{¶73} In regard to R.C. 2151(D)(1)(d), the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, the trial court determined that "[C.P.]'s need for a legally secure, permanent placement cannot be achieved without granting of permanent custody to PCJFS" and that "no appropriate relatives were available for the care and custody of [C.P.]" Finally, the trial court also determined that C.P. did not meet the criteria for a Planned Permanent Living Arrangement.

{¶74} Mother contends that the trial court's determination is inconsistent with the evidence presented. Specifically, Mother states that she completed her case plan, and improved the conditions of the home to make it suitable or appropriate for a child.

{¶75} The court below noted and recognized that Mother and Father completed their case plans, however the court found that Mother and Father were "not capable of initiating, let along providing, permanency for a child with such profound needs as [C.P.]" Additionally, the court below determined that neither parent could provide a legally secure permanent placement of C.P. and that neither had remedied the concerns that led to

Case No. 2025-P-0075

C.P.'s removal and that that neither parent "was able to sufficiently demonstrate the level of dependability and critical thinking necessary to safely maintain [C.P.] under their care."

{¶76} The court also recognized the efforts to improve the condition of the household. The court below noted that at the time of removal, C.P. did not have a bed, she was still in diapers, she could not speak, and she had not received medical care for some time. Mother and Father were using baby gates to contain C.P. and were utilizing zip ties to keep C.P.'s clothes together and duct tape to secure C.P.'s diapers. While pursuing their case-plan objectives, Mother and Father made some improvements, including getting a bed for C.P., organizing her room, and having toys for her. However, the use of baby gates remained a concern. The court also noted that Father did not fully appreciate the problems with his approach to parenting. The trial court recognized that this was due, in part, to the parents' own cognitive limitations.

{¶77} Mother also contends that the trial court's finding that "no appropriate relatives were available for the care and custody of [C.P.]" was based on insufficient evidence. Specifically, Mother suggests that "more testimony is needed to determine why the maternal grandparents would not take custody." Rodkey testified that the grandparents were ruled out for custody because "they broke the conditions of the unsupervised visits."

{¶78} As this court recognized in *In re J.H.*, 2025-Ohio-811 (11th Dist.), "[i]t is well-established that 'the [permanent custody] statute does not require a juvenile court to consider relative placement before granting the motion for permanent custody.'" *Id.* at ¶ 20, quoting *In re A.C.H.*, 2011-Ohio-5595, ¶ 44 (4th Dist.); *In re S.S.*, 2023-Ohio-1663, ¶ 35 (6th Dist.) ("in satisfying its duty to determine whether permanent custody to the

Case No. 2025-P-0075

agency is in a child's best interest, the juvenile court was not required to determine whether maternal great-grandmother or any other relative was available for placement"). Further, "'[w]hile a children services agency should strive to place a child with a willing and suitable relative, ... we will not impose a duty on the agency to search for and examine every possible relative, especially those that have never indicated a desire to be considered as a placement option.'" *Id.* quoting *In re Brown*, 2004-Ohio-3337, ¶ 14. Accordingly, Mother's arguments regarding the placement of C.P. with relatives is factually and legally unavailing.

{¶79} The final factor, R.C. 2151.414(e), requires consideration of whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. R.C. 2151.414(E)(11) provides:

> The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶80} The court below determined that R.C. 2151.414(E)(11) applied to Mother but made no similar finding as to Father. Mother avers that "her compliance with the case plan goals and her improvements to the home provide evidence that she can provide a legally secure placement.

{¶81} As observed previously, Mother alleges that the trial court abused its discretion in finding that permanent custody is in the best interest of the child. We disagree.

{¶82} As noted above, Mother takes issue with the trial court's determination as to factors (a), (d), and (e). First, the magistrate's decision recognized that C.P.'s parents loved her. However, Rodkey testified that C.P. and her parents were not bonded and that C.P. had a bond with her foster family. Humrighouse testified that it was "strange" and that she did not see C.P. attached to Mother or observe anything like that. Humrighouse also testified that "just no connection, limited." Upon review of the record, there is nothing to suggest that the trial court erred in its determination that there was no true bond between C.P. and Mother.

{¶83} Mother next asserts that the trial court erred in its decision regarding the child's need for a legally secure and permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. The trial court recognized that Mother completed some of her case plan, the completion of a case plan does not preclude a court from terminating a parent's rights. See *In re E.R.,* 2023-Ohio-1468, ¶ 45 (4th Dist.).

{¶84} The record is replete with testimony and evidence from multiple sources that the parents struggled to independently care for the child. While Mother completed her parenting classes, she did not successfully complete the program as she earned a certificate of noncompliance. Moreover, it was clear from the record that Mother and Father required prompting from others to perform certain tasks and engage appropriately with C.P. It is also evident from the record and testimony that the parents failed to remedy various concerns regarding the home. While some positive steps were taken, such as purchasing a bed and organizing the child's room, several concerns were not addressed. Despite Mother's financial stability and her obvious love for C.P., neither Mother nor

Father were equipped or able to give C.P. the level of care required to address her special needs.

{¶85} Humrighouse and Goldner each testified that they did not recommend reunification for Mother and C.P. Additionally, Dr. Thomas opined that due to Mother's and Father's cognitive limitations, "it was going to make it . . . nearly impossible for them to independently raise a child with such profound needs. . . ."

{¶86} Furthermore, there were no appropriate family members available to care for or take custody of C.P. or a type of placement that can be achieved without a grant of permanent custody to PCJFS. While it is clear the grandparents may have been initially considered, they were subsequently ruled out as an appropriate placement option due to their noncompliance with the safety plan.

{¶87} Upon review of the record, we find that the trial court did not error in determining that it was in the best interest of C.P. to grant permanent custody to PCJFS.

{¶88} Accordingly, we conclude that the trial court's best-interest analysis and judgment is consistent with the manifest weight of the evidence.

{¶89} Mother's sole assignment of error is without merit.

## Conclusion

{¶90} For the reasons set forth above, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.


EUGENE A. LUCCI, J.,

SCOTT LYNCH, J.,

concur.

Case No. 2025-P-0075

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

Costs to be taxed against appellant.

_____
JUDGE ROBERT J. PATTON

_____
JUDGE EUGENE A. LUCCI,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-P-0075