[Cite as *In re B.R.H.*, 2025-Ohio-5181.]

# IN THE COURT OF APPEALS OF OHIO
# ELEVENTH APPELLATE DISTRICT
# LAKE COUNTY

IN THE MATTER OF:

B.R.H., F.L.H, C.A.H., M.J.H.,
C.L.H., AND B.M.H.,
DEPENDENT CHILDREN

| | |
|---|---|
| **CASE NOS. 2025-L-066** | |
| **2025-L-067** | |
| **2025-L-068** | |
| **2025-L-070** | |
| **2025-L-071** | |
| **2025-L-072** | |

Civil Appeals from the
Court of Common Pleas,
Juvenile Division

Trial Court Nos. 2022 DP 00871
2022 DP 00870
2022 DP 00872
2022 DP 00868
2022 DP 00873
2022 DP 00869

---

## OPINION AND JUDGMENT ENTRY

Decided: November 17, 2025
Judgment: Affirmed

---

*Mandy J. Gwirtz*, 20050 Lakeshore Boulevard, Euclid, OH 44123 (For Appellant, Cierra Hicks).

*Christopher J. Boeman*, Lake County Department of Job & Family Services, 177 Main Street, Painesville, OH 44077 (For Appellee, Lake County Department of Job and Family Services).

*John W. Shryock*, John Shryock Co., L.P.A., 30601 Euclid Avenue, Wickliffe, OH 44092 (Guardian ad litem).

*Brett J. Plassard*, 1875 West Jackson, Painesville, OH 44077 (For Minor, B.R.H.).

*Jerri Mitchell*, P.O. Box 1126, Fairport Harbor, OH 44077 (For Minor, F.L.H.).

*Rebecca J. Castell*, 24 Public Square, Willoughby, OH 44094 (For Minor, C.A.H.).

*Michelle E. Goldstein*, 1337 Elmwood Road, Mayfield Heights, OH 44124 (For Minor, M.J.H.).

*Cory R. Hinton*, Hanahan & Hinton, L.L.C., 7351 Center Street, Suite 1, Mentor, OH 44060 (For Minor, C.L.H.).

*Pamela D. Kurt*, Kurt Law Office, L.L.C., 30432 Euclid Avenue, Suite 116, Wickliffe, OH 44092 (For Minor, B.M.H.).

EUGENE A. LUCCI, J.

{¶1} Appellant, C.H. ("Mother"), appeals the judgments of the Lake County Court of Common Pleas, Juvenile Division, granting permanent custody of six of her children to the Lake County Department of Job and Family Services ("LCDJFS"). At issue in this matter is whether the trial court erred in denying Mother's motion to dismiss where LCDJFS allegedly failed to present clear and convincing evidence that it made reasonable efforts toward reunification. Mother additionally contends that the award of permanent custody to LCDJFS was against the manifest weight of the evidence because it was contrary to the children's best interests. We affirm.

{¶2} The underlying cases originated in the Lake County Court of Common Pleas, Juvenile Division, commencing with the August 9, 2022 granting of emergency custody to LCDJFS of seven minor children: M.S.R.H. (DOB: 7/23/08), M.J.H. (DOB: 3/5/10), B.M.H (DOB: 5/16/11), B.R.H (DOB: 11/22/12), C.L.H. (DOB: 10/18/14), C.A.H. (DOB: 10/24/15), and F.L.H. (DOB: 4/11/17). Mother was present with counsel and agreed to LCDJFS' temporary custody due to housing issues. The guardian ad litem ("GAL") appointed to the cases was also present. The father of F.L.H and B.M.H., E.P. ("Father"), was also present. Father also agreed that the children should continue in LCDJFS' temporary custody.

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072

{¶3} On November 1, 2022, the children were adjudicated dependent. On November 9, 2022, a disposition was held and Mother agreed to a case plan, which the trial court adopted. Mother's case plan goals required her to obtain safe and stable housing, complete a mental health assessment and follow recommendations from the assessment, and complete a drug and alcohol assessment and follow the recommendations from the assessment.

{¶4} On March 2, 2023, LCDJFS filed a show-cause motion alleging Mother was not in compliance with or working toward her case plan goals. A full hearing on the motion was held on January 4, 2024. The trial court determined that Mother should not be held in contempt.

{¶5} Various review hearings and extension hearings were held throughout the pendency of these cases. On August 1, 2023, a hearing was held on the first six-month extension of temporary custody to LCDJFS. Mother was excused because she had previously indicated she agreed with the motion. Father did not attend the hearing. Temporary custody was accordingly extended with the magistrate finding that (1) Mother "does not have stable housing" for the children, (2) "reasonable efforts were made to avoid continued removal" of the children from the home, and (3) neither Mother nor Father were case-plan compliant.

{¶6} On February 28, 2024, a hearing was held on the second extension of temporary custody to LCDJFS. Neither Mother nor Father attended. In extending temporary custody, the magistrate determined that (1) "reasonable efforts were made to avoid continued removal," (2) Mother "does not have stable housing," (3) "Mother was

recently incarcerated," (4) "Mother discontinued counseling services in July of 2023," and (5) neither Mother nor Father were case-plan compliant.

{¶7} On May 7, 2024, LCDJFS filed for permanent custody. At the time of the filing, the children had been in LCDJFS' temporary custody for 20 months, and 18 months had elapsed since the adjudication. A pretrial on the motion was held on July 11, 2024; Mother was present with counsel, but, although duly served, Father was not present.

{¶8} The motion for permanent custody was set for trial on August 8, 2024. Mother was present with counsel. Father was present and requested court-appointed counsel. The trial was continued in part due to Father's request for counsel and in part because none of the children had court-appointed counsel.

{¶9} On September 20, 2024, a pretrial occurred relating to Mother's emergency motion to resume visitation, filed on August 15, 2024. Mother, however, did not attend despite being duly notified. Father was present with counsel.

{¶10} On October 31, 2024, a pretrial was held on Mother's motion for LCDJFS to pay for a custody evaluation. LCDJFS did not object, despite the pendency of the motion for permanent custody. At the time, the children had been in LCDJFS' temporary custody for 26 months. The motion was granted and, pursuant to Mother's request, Dr. Ryan Mekota was appointed to conduct the evaluation.

{¶11} Because of the challenge of accommodating the schedules of the GAL, seven attorneys for the children, and counsel for both Mother and Father as well as LCDJFS, a new trial date was not scheduled until April 2, 2025. The three-day trial commenced on that date. The trial court granted LCDJFS' motion for permanent custody on May 8, 2025. Mother now appeals.

**Standard of Review**

{¶12} The Supreme Court of Ohio set forth the appropriate standard of review for appellate challenges to a trial court's granting of a motion for permanent custody in *In re Z.C.*, 2023-Ohio-4703. In that case, the Court observed:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.
>
> . . .
>
> Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, . . . 2012-Ohio-2179, . . .¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 . . . (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on its *effect in inducing belief*'" (emphasis sic), *id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"" *Bryan-Wollman v. Domonko*, . . . 2007-Ohio-4918 . . ., ¶ 3, quoting *Thompkins* at 386, quoting *Black's* at 1433.
>
> But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072

such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id*. at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 11, 13-14.

{¶13} Mother's first assignment of error alleges:

{¶14} "The trial court erred in denying appellant's motion to dismiss under Civ.R. 41(B)(2) where the department failed to present clear and convincing evidence that it had made reasonable efforts toward reunification."

{¶15} Mother argues that the trial court erred in finding that LCDJFS made reasonable efforts to prevent the removal and continued removal of the children from the home and that granting permanent custody to LCDJFS was against the manifest weight of the evidence.

**Reasonable Efforts**

{¶16} "When the state intervenes to protect a child's health or safety, '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called "reasonable efforts."'" *In re C.F.*, 2007-Ohio-1104, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260

(2003). Various sections of the Ohio Revised Code set forth an agency's duty to make reasonable efforts; the concept is not encompassed in a single section. *In re C.F.* at ¶ 29.

{¶17} LCDJFS filed its motion for permanent custody pursuant to R.C. 2151.413. Pursuant to R.C. 2151.419(A)(1), the agency that removed the child from the home must have made reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the home, or make it possible for the child to return home safely. The statute assigns the burden of proof to the agency to demonstrate it has made reasonable efforts. *Id.*

{¶18} The statutory requirement that a court shall determine whether an agency has made reasonable efforts to return a child to the parents' home, however, does not apply in a permanent custody proceeding. *In re C.F.* at ¶ 41-42. Instead, the "reasonable efforts" requirement applies at other, earlier stages of the proceeding. *Id.*

{¶19} "R.C. 2151.419 *does not apply* in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413 and R.C. 2151.414. . . . [T]his does not mean that the agency is relieved of the duty to make reasonable efforts." (Emphasis added.) *In re J.J.F.*, 2009-Ohio-4736, ¶ 24 (5th Dist.), citing *In re C.F.*, 2007-Ohio-1104, at ¶ 42. Instead, "'the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification.'" *In re J.J.F.* at ¶ 24, quoting *In re C.F.* at ¶ 42. However, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F.* at ¶ 43.

{¶20} Thus, it is only when the agency "has not already proven reasonable efforts [that the agency] must do so at the hearing on a motion for permanent custody." *Id.* at ¶

4, 43. The Supreme Court in *In re C.F.* emphasized that the trial court had made findings as to reasonable efforts throughout that case. The reasonable efforts findings were made at the removal, adjudication, temporary custody, and review hearings. *Id.* at ¶ 45. Consequently, there was no need to re-establish the efforts at the permanent custody hearing. *Id.*

{¶21} In this matter, on November 1, 2022, at the adjudicatory hearing finding the children dependent, the magistrate determined that LCDJFS had been working with Mother to secure housing for herself and the children. The magistrate further determined that Mother related to LCDJFS that she could no longer care for the children and agreed to grant LCDJFS temporary custody. Although the magistrate did not use the "reasonable efforts" language in his decision, we conclude the statements in the decision reflect LCDJFS' reasonable efforts at the time of the adjudicatory hearing. Mother did not challenge to this decision.

{¶22} On November 9, 2022, a dispositional hearing was held wherein Mother's case plan was set forth. One of the primary goals of the case plan was for Mother to obtain stable housing. The magistrate found that while Mother lost her "extended housing," LCDJFS continued to work with her to secure housing for the minor children as well as Mother. The magistrate reiterated Mother's statement that she could no longer care for the children. Nevertheless, in his "decision", the magistrate found that "[r]easonable efforts have been made to prevent the continued need to remove the above named child[ren] from the home, however, placement in the home at this time is contrary to the child[ren]'s best interests." Mother did not "challenged" this "decision."

{¶23}   On August 1, 2023, a hearing was held before the magistrate on LCDJFS' motion to extend temporary custody. In his "decision", the magistrate found that "reasonable efforts were made to avoid continued removal of the child[ren] from the home, but that removal from the home at this time is in the child[ren]'s best interest." The magistrate further determined that Mother did not have stable housing, and that Mother was not compliant with the case plan goals enumerated in the November 9, 2022 decision. Again, Mother did not "challenged" this "decision."

{¶24}   Next, on February 28, 2024, a hearing was conducted before the magistrate on LCDJFS' second motion to extend temporary custody. Similar to the previous "decision", the magistrate determined that "reasonable efforts were made to avoid continual removal of the child[ren] from the home, but that removal from the home at this time is in the child[ren]'s best interest." The magistrate further concluded that Mother had not yet obtained stable housing and was "recently incarcerated." The magistrate also found that Mother "discontinued counseling services in July 2023[,]" another condition of Mother's case plan. The magistrate accordingly determined Mother was not compliant with her case plan goals. Mother did not "challenged" this "decision".

{¶25}   In addition to these points, the record demonstrates that even though LCDJFS had tried to assist Mother to obtain housing, Mother claimed she was already working with Lake County Metropolitan Housing Authority. Specifically, according to Mother's social worker, Samantha Priggins, Mother

> had always indicated to me every time we talked that she was working with LMHA. So that's a resource I would have provided to her, but she was working with LMHA. We had also spoke to her about the property source that the Department would offer, but she did have an eviction on her record, and I did inform her she would need to pay her eviction off and go

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072

to the court, have her eviction get expunged, and to my knowledge, she did not do that.

{¶26} According to Ms. Priggins, "the most important piece of this case was the housing situation and, reunification couldn't happen if there wasn't stable housing."

{¶27} Additionally, Mother initially had one hour of visitation per week with all of her children at LCDJFS. According to Ms. Priggins, Mother was "pretty consistent" in attending visits although "she missed some visits, and was late to a lot of them." And, eventually, Mother requested that her visits occur only once a month even though she was permitted to visit weekly with six of the seven children. Mother's request was premised upon transportation issues. Ms. Priggins recognized she did not provide Mother with bus passes or gas cards, but Mother did not ask for such benefits.

{¶28} Under the circumstances, the magistrate, on four separate occasions, acknowledged that "reasonable efforts" were made to avoid the continued removal of the children. And the magistrate acknowledged Mother was not compliant with her case plan. If she disagreed with the magistrate's determinations, she could have raised appropriate challenges in the trial court. She did not do so. These points, in addition to Mother's acts and omissions in relation to housing and visitation reflect more upon the reasonableness of Mother's efforts than the reasonable efforts of LCDJFS.

{¶29} Moreover, in *In re C.F.*, 2007-Ohio-1104, the Court observed that the law, under certain circumstances, dispenses with the duty to make reasonable efforts to reunify the family. Under R.C. 2151.419(A)(2)(b), an agency need not make reasonable efforts if the "parent from whom the child[ren were] removed has repeatedly withheld medical treatment or food from the child[ren] when the parent has the means to provide the treatment or food." *See also In re C.F.* at ¶ 34. In its final judgment entry, the trial court

determined that Mother has repeatedly withheld food from the children when she had the means to provide the food.

{¶30} The record supports this conclusion as, according to Dr. Mekota, several of the children (M.J.H., B.R.H., and C.A.H.) complained about limited access to food, having to eat spoiled food, or stealing food when they were left alone.

{¶31} Given the evidence, as well as the magistrate's determinations, we conclude LCDJFS made reasonable efforts to prevent the removal of the children from Mother's home/custody or eliminate the continued removal of the children from Mother's home/custody. The trial court did not err in denying Mother's motion to dismiss LCDJFS' motion for permanent custody.

{¶32} Mother's first assignment of error lacks merit.

{¶33} Mother's second assignment of error provides:

{¶34} "The trial court's decision granting permanent custody to Lake County Department of Job and Family Services was against the manifest weight of the evidence and contrary to the child's best interests."

**Standards for Granting a Motion for Permanent Custody**

{¶35} R.C. 2151.414(B)(1) specifies that a trial court may grant a children services' agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) any of the following conditions applies:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072

months of a consecutive 22-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶36} In the case at bar, the juvenile court found that R.C. 2151.414(B)(1)(d) applies. Mother does not dispute this finding but instead argues that the juvenile court's determination placing the children in LCDJFS' permanent custody was in the children's best interest was against the manifest weight of the evidence.

{¶37} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072

child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶38} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "'all relevant [best interest] factors,'" as well as the "five enumerated statutory factors." *In re C.F.*, 2007-Ohio-1104, at ¶ 57, quoting R.C. 2151.414(D). None of the best interest factors, however, requires a court to give it "greater weight or heightened significance." *In re C.F.* at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.). In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).

{¶39} Mother contends the trial court failed to give adequate weight to the various applicable best-interest factors. Initially, Mother takes issue with the trial court's consideration of "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child. . . ." R.C. 2151.414(D)(1)(a). She also asserts the trial court improperly weighed "the wishes of the child[ren], as expressed directly by [them] . . . with due regard for the maturity of the child[ren]. . . ." R.C. 2151.414(D)(1)(b).

{¶40} Mother argues that some of the children are living together, but they collectively remain in two separate foster homes. Mother emphasizes she has a close

relationship with her older children and, even though she repeatedly requested reunification counseling to repair the relationship with her younger children, her LCDJFS' case worker did not make such arrangements. Further, Mother asserts the trial court gave improper weight to the younger children's reluctance to visit her.

{¶41} In its judgment, the trial court determined:

> Mother could have visited most of the children weekly but because [B.M.H.] was only able to be transported to visits once a month Mother chose to come only once a month. [B.R.H.], [F.L.H.], and [C.A.H.] often do not wish to visit with mother and want to be adopted by their foster mothers, who are foster to adopt.
>
> [M.S.R.H.] is placed in a foster to adopt foster home and has not expressed a desire to be adopted. Although [M.S.R.H.] is bonded with Mother, [M.S.R.H.] has expressed frustration with [Mother] not getting a home where she can care for her children first. [M.S.R.H.] appears realistic about Mother's inability to care for the children.
>
> [M.J.H.], [C.L.H.], and [B.M.H.] have visits with Mother and appear bonded. The current wishes on being adopted is unclear but they likely would want to go home with Mother if Mother had a home for them to go to. The current foster mother for [M.J.H.] and [C.L.H.] is not currently foster to adopt but may take the necessary steps to become foster to adopt. The same foster mother intends on taking [B.M..H.] into her care once he complete[s] residential treatment in the near future.

{¶42} The trial court considered the interaction and interrelationship with Mother. One constant theme of the underlying proceedings, however, was LCDJFS' as well as the children's concerns for lack of stable housing. Despite reasonable efforts, Mother was unable to obtain such housing and therefore failed to meet this fundamental case plan goal.

{¶43} Even though some of the children wish to visit with Mother, others do not. The trial court did not err in highlighting this point, nor did it overemphasize the fact that three of the children do not want to visit Mother. Furthermore, although the trial court did not expressly consider the interrelationship of the siblings with one another in its R.C. 2151.414(D)(1)(a) considerations, it did point out that "[i]n the event that permanent custody is granted, it is very important to facilitate communication and visits between the children as they have shared experiences and can be a source of support for each other." The testimony of the foster parents did not suggest that such a recommendation was unrealistic or impossible. Viewed as a whole, we conclude the trial court adequately considered the R.C. 2151.414(D)(1)(a) factors.

{¶44} Next, Mother takes issue with the trial court's treatment of the children's custodial history. R.C. 2151.414(D)(1)(c) provides, in relevant part, that a trial court must consider: "The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period. . . ." Mother asserts that regardless of whether LCDJFS met this factual element, the permanent custody motion was pending for 10 months before trial, during which LCDJFS made no efforts at reunification. Accordingly, she maintains that the prolonged custody with LCDJFS was not the product of her indifference, but LCDJFS' refusal to act.

{¶45} Although Mother suggests that LCDJFS made no efforts at reunification during the pendency of the motion for permanent custody, LCDJFS did not object to Mother's motion for a publicly paid custody evaluation, filed on October 18, 2024 (over two months after the motion for permanent custody was filed). The trial court granted

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072

Mother's motion and, as a result, set a trial date for April 2, 3, and 4, 2025. The trial court considered the custodial history and, in light of the evidence, did not ignore any crucial factors or nuances relating to the same.

{¶46} Mother next challenges the trial court's assessment of the children's need for legally secure placement. R.C. 2151.414(D)(1)(d) requires a court to assess the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. . . ."

{¶47} The evidence supporting this factor is closely related to the evidence addressed under Mother's first assignment of error; namely, the nature and extent of LCDJFS' reasonable efforts to prevent continued removal from Mother's home and reunify them with Mother. As discussed throughout this opinion, a seminal issue in this matter was Mother's inability to acquire stable housing to accommodate her seven children. Mother concedes this was the primary feature of her case plan and the main barrier to reunification.

{¶48} As noted above, Mother surrendered custody initially because she lacked adequate housing. At the November 2022 hearings, Mother acknowledged she did not have the resources or housing to care for the children. Over two and one-half years later, at the April 2025 permanent custody hearing, Mother still lacked adequate housing.

{¶49} Moreover, the GAL, John Shryock, expressed some concern and disappointment about LCDJFS' efforts to accomplish reunification of the children. He asserted his belief that communication could have been "far better" between LCDJFS and Mother. Still, he was only able to speak with Mother at the courthouse because she did not respond to his other communications.

{¶50} Mr. Shryock emphasized his primary concern was Mother's inability to find housing for all of the children in conjunction with her inability to have regular employment. Mr. Shryock testified that he would recommend permanent custody to LCDJFS because "it is not in the children's best interests to be placed with a parent that does not have a residence, that does not have an appropriate residence."

{¶51} In its judgment entry, the trial court concluded that Mother has not demonstrated that she is in a position to provide the children with a secure, permanent placement. The court also underscored that Mother has made little progress to secure any such housing.

{¶52} Given the tumultuous and uncertain nature of Mother's living situation, in conjunction with the number of children whose interests are at issue, we conclude that the trial court's best-interest analysis and judgment is consistent with the manifest weight of the evidence.

{¶53} Mother's second assigned error lacks merit.

{¶54} The judgments of the Lake County Court of Common Pleas, Juvenile Division, are affirmed.

MATT LYNCH, J.,

SCOTT LYNCH, J.,

concur.

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072

## JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error lack merit. It is the judgment and order of this court that the judgments of the Lake County Court of Common Pleas, Juvenile Division, are affirmed.

Costs to be taxed against appellant, Cierra Hicks.


_____
JUDGE EUGENE A. LUCCI


_____
JUDGE MATT LYNCH,
concurs


_____
JUDGE SCOTT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case Nos. 2025-L-066, 2025-L-067, 2025-L-068, 2025-L-070, 2025-L-071, 2025-L-072