[Cite as *In re R.E.A.*, 2026-Ohio-2422.]

# IN THE COURT OF APPEALS OF OHIO
# ELEVENTH APPELLATE DISTRICT
# PORTAGE COUNTY

| | |
|---|---|
| IN THE MATTER OF:<br><br>R.E.A., H.F.A., AND E.R.A.,<br>DEPENDENT CHILDREN | **CASE NOS. 2026-P-0017<br>2026-P-0018<br>2026-P-0019**<br><br>Civil Appeals from the<br>Court of Common Pleas,<br>Juvenile Division<br><br><br>Trial Court Nos. 2023 JCC 00219<br>2023 JCC 00220<br>2023 JCC 00221 |

---

## OPINION AND JUDGMENT ENTRY

Decided: June 25, 2026
Judgment: Affirmed

---

*Jason M. Jordan*, Jason M. Jordan Legal Services, L.L.C., 3580 Darrow Road, Stow, OH 44224 (For Appellant, Robert L. Eiben).

*Connie J. Lewandowski*, Portage County Prosecutor, and *Julia B. Adkins*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Appellee, Portage County Department of Job and Family Services).

*Lucinda L. Gazley*, 16064 High Street, Burton, OH 44021 (Guardian Ad Litem).

*Thomas Grist*, 114 Barrington Town Square Drive, 342, Aurora, OH 44202 (For Minor, R.E.A.).

JOHN J. EKLUND, J.

{¶1} Appellant, Robert Eiben ("Father"), appeals the judgment of the Portage County Court of Common Pleas, Juvenile Division, terminating his parental rights.

{¶2}   Appellant has raised one assignment of error arguing that the trial court's judgment was against the manifest weight of the evidence and contrary to the best interest of the three minor children.

{¶3}   Having reviewed the record and the applicable caselaw, we find Appellant's assignment of error is without merit. The evidence at the permanent custody hearing supports the trial court's judgment entry granting the Portage County Department of Job and Family Services ("PCJFS") permanent custody of the children.

{¶4}   Therefore, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

## Substantive and Procedural History

{¶5}   Father and Crystal Ables ("Mother") are the natural parents of R.A., DOB 10-7-2015; H.A., DOB 5-10-2018; and E.A., DOB 8-20-2020.

{¶6}   On May 25, 2023, the children were removed from the parents' custody.

{¶7}   On May 26, 2023, PCJFS filed Complaints alleging that R.A., H.A., and E.A. were abused, neglected, or dependent children.

{¶8}   On June 30, 2023, the trial court adjudicated the children dependent.

{¶9}   On July 17, 2023, PCJFS filed the Case Plan for Mother and Father to complete. The case plan set forth the following requirements:

{¶10}  **Mother:** (1) sign all releases of information; (2) complete mental health evaluation and comply with recommendations; (3) complete Lighthouse evaluation and comply with recommendations; (4) complete random drug screening; (5) secure safe and stable housing; and (6) engage in family counseling.

{¶11} **Father:** (1) sign all releases of information; (2) complete random drug screening; (3) substance and mental health assessment and comply with recommendations; (4) complete Lighthouse evaluation and comply with recommendations; (5) engage in family counseling; and (6) genetic paternity testing.

{¶12} On July 27, 2023, the case plan was adopted, and the children were placed in the temporary custody of PCJFS.

{¶13} On May 16, 2024, the trial court held an Annual Review Hearing. PCJFS requested a six-month extension of temporary custody. The parties stipulated that the parents were making significant progress in their case plans.

{¶14} On October 7, 2024, PCJFS requested a second extension of temporary custody. The parties again stipulated that the parents had made progress on their case plans.

{¶15} On April 23, 2025, PCJFS filed a Motion for Permanent Custody and Termination of Parental Rights. PCJFS stated that the children had been in the custody of PCJFS for 12 or more months out of a consecutive 22-month period and that the parents had failed to substantially remedy the conditions necessitating the removal of the children. PCJFS argued that it was in the best interests of the children to be placed in the permanent custody of PCJFS.

{¶16} On September 23, 2025, Father filed a Motion for Legal Custody.

{¶17} On September 24, 2025, Mother filed a Motion for Legal Custody.

{¶18} The magistrate held a hearing on permanent custody and the parents' motions for legal custody on September 30, 2025, and October 3, 2025. The following facts and evidence were adduced:

{¶19} Thresa Lenart denied ever selling, renting, or leasing her home to Mother and denied ever having met her before.

{¶20} Marija Prodanovic, a Social Service Worker with PCJFS, testified that she assessed Mother's and Father's residence after the Streetsboro Police Department removed the children from the home in June 2023. Mother and Father were residing in a room at a Motel 6 in Streetsboro, Ohio. The conditions were "very cluttered, a lot of items stacked next to the walls," and the floors were covered with "a lot of clutter and trash." The room had two beds and a "makeshift sleeping cot."

{¶21} Anessa Scyoc testified that she is employed by The Village Network as a clinical case manager for foster care. She said The Village Network provides services for R.A., H.A., and E.A, including psychotherapy and case management services. Scyoc had observed the children with their foster parents and described those interactions positively. The children got along with and were bonded to their respective foster parents and engaged well with other children in the home. They were all involved in extracurricular activities and doing well in their schooling.

{¶22} Felicia Keen testified that she had been E.A.'s foster parent since September 2023. E.A. came to the house at three years old and was five at the time of the hearing. She attended preschool and was beginning to read. She was involved in tap and ballet classes as well as gymnastics. Keen said that she also has a one-year-old daughter and that E.A. and Keen's daughter were close. E.A. was very involved and bonded with Keen's extended family. Keen's intention was to adopt E.A. and ensure that R.A. and H.A., who were placed in separate homes, would be able to maintain contact with their sister. She said that they regularly get all of the siblings together. When asked

if she would allow Mother and Father to maintain a relationship with E.A., Keen said, "I wouldn't be opposed per se, but I think that's something that I would need to think about and discuss further."

{¶23} Megan Hart testified that she had been H.A.'s foster parent since May 2023. H.A. came to the house at five years old. She was not potty trained when she came into the home and did not communicate well or understand emotions. At the time of the hearing, H.A. was seven. She was in school and making strides toward better communication and had been potty trained. H.A. was receiving occupational and physical therapy through the school to assist in some of her challenges. H.A. was also set to begin speech therapy and to undergo testing for autism. H.A. was also involved in cheer.

{¶24} Hart lived with her husband and four children and said that H.A. was well-integrated into the family. She said that her intention was to adopt H.A. and allow her to maintain a relationship with her siblings. Making this easier was that R.A. was placed with Hart's mother, and she was close childhood friends with Keen. When asked if she would maintain a relationship with Mother and Father, Hart said,

> Um, I feel like it would have to be a decision me and my husband would both come together about. We have adopted four children already, and we do not have no relationship with the natural family besides my oldest, which she doesn't have a relationship with the bio parents, but she does have a relationship with like aunts and a grandma so I feel like that would try to have to be something would have to approach me like when the time was given. It's just kind of like something I wouldn't just want to make the decision for just myself. It would have to be the decision with me and my husband as well.

{¶25} Jodonna Scalf testified that she has been R.A.'s foster parent since May 2023. Scalf said that R.A. was "very much parentified" and tried to parent her younger siblings. Over time, R.A. acted more within her role as a sister. At the time of the hearing,

she was involved in cheer and doing well at school. R.A. was well adjusted to home life and got along well with the other children in the home. Scalf said that she wanted to adopt R.A. and that she would keep in close contact with her siblings. Scalf said she would "consider" maintaining contact with Mother and Father and would not rule it out. R.A. had expressed a desire to be adopted but also wanted to maintain contact with her birth parents.

{¶26} Cheryl Griffin testified that she is a licensed social worker at the Village Network. She said that she holds therapy sessions twice a month with R.A. Therapy was helpful for dealing with R.A.'s acute stress disorder. One of the goals of therapy was to help R.A. with healthy physical boundaries.

{¶27} Dr. Aimee Thomas founded the Lighthouse Family Center and provides psychological, parenting, and custody evaluations for courts. Dr. Thomas said that she is a licensed psychologist and licensed professional clinical counselor. The purpose of a parenting evaluation is to provide treatment recommendations with a goal of reunification.

{¶28} She said that she performed parenting assessments with Mother and Father. Those assessments were admitted into evidence.

{¶29} **Mother's assessment:** Mother had given birth to nine children. Three children were placed in the custody of their biological father. Mother had lost permanent custody of three other children, and R.A.'s, H.A.'s, and E.A.'s status was pending. She had been unable to complete prior case plans for the six older children. She also had a history of unstable housing and lived in hotels. There were also reports of domestic violence between herself and Father. Mother's intelligence assessment placed her in the below-average range of intellectual ability, indicating a need for additional support and

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

training in parenting. Other assessment tools indicated a reduced ability to handle stress, act independently, and protect herself and her children from abusive dynamics. Mother responded defensively to the assessments and continually denied experiencing stresses or difficulties in raising the children.

{¶30} Mother failed to complete a substance abuse assessment in its entirety. She remained committed to maintaining a romantic relationship with Father despite his criminal history and convictions for sexually oriented offenses. She also reported that Father would become physically aggressive when she did not engage in sexual activity with him. Dr. Thomas described this as a "very unhealthy dynamic, particularly because they were living in a hotel room with their three children, arguably with limited privacy so she described a very unhealthy relationship and yet was not at a point where she was contemplating ending the relationship." Mother was not employed and had not been for several years. Her biggest obstacle was her ongoing connection with Father.

{¶31} Other behaviors that raised concerns included Mother staying up until 3:00 or 4:00 in the morning and disrupting the children's sleep.

{¶32} Dr. Thomas concluded that Mother was capable of being an appropriate parent but appeared unwilling to make sacrifices for them and appeared more attached to Father than to the children.

{¶33} Dr. Thomas recommended that Mother engage in: weekly individual counseling; intensive parenting counseling and skill training; secure and maintain ample employment; secure and maintain appropriate housing for herself and the children; and that she not regain custody of the children unless Father also completed all aspects of his case plan if they remained romantically involved.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

{¶34} She said that if Mother did not complete the recommendations, she would not recommend Mother regain custody of the children because they would be at significant risk of harm.

{¶35} **Father's assessment:** Father had a historic involvement with child protective services and a criminal history. Father was convicted of a sexually oriented offense involving his sister when he was a juvenile. He was also convicted of attempting to sexually abuse his four-to five-year-old child from a previous relationship and twice failed to register as a sex offender. Dr. Hart said that the children presented "some sexualized behaviors such as humping." There were also concerns with Father's marijuana use: first, that he left marijuana out on the counter within reach of the children; second, that his consistent use three to four times a day demonstrated a high likelihood of cannabis use disorder.

{¶36} Father did not exhibit any intellectual capacities that would hinder his ability to participate or learn from treatment services. However, he demonstrated low self-esteem and depressive symptoms.

{¶37} Father also appeared frustrated that Mother did not take on more responsibilities in raising the children and questioned whether she could raise the children independently of his support.

{¶38} Father's capability of being an appropriate parent hinged on his willingness to follow through with the recommendations, including the risk assessments, and compliance with treatments to reduce risk factors and address his underlying emotional difficulties and history of violence.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

{¶39} Dr. Thomas recommended that Father participate in a sex offender evaluation, an intensive parenting class, and substance abuse treatment and sobriety and that he undergo mental health treatment, demonstrate an ability to secure and maintain housing, and obtain gainful employment.

{¶40} However, given Father's prior sexual abuse convictions and fixation on pornography, Dr. Thomas said that she was "troubled at the prospect of [Father] regaining custody of his children without the oversight of a [competent] adult that oversees his interactions with the children." She said that if Father was not in a relationship with someone who would "oversee and ensure the safety of the children," it would be "troubling" to allow father to have custody of the children.

{¶41} Dr. Thomas said that if Father did not complete the recommendations, she would not recommend Father regain custody of the children because they would be at significant risk of harm.

{¶42} Jennifer Fire, supervisor of parenting programs at Goodwill Industries, testified that she coordinates and staffs parenting classes designed to improve parenting skills. There are two levels of certificates issued for successfully engaging in the class. The first is "completion" and the second is "participation."

{¶43} Mother started attending parenting classes in September 2024 and ended in December 2024. PCJFS admitted Mother's Discharge Report, summarizing her coursework over the 11-week program. Mother had four unexcused absences and one excused absence. When she did attend, she did not participate and exhibited a negative attitude. She talked to other parents during classes rather than engaging in the material.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

Mother's hygiene was also at issue and required rearranging seating during classes due to odor.

{¶44} Mother did not complete any of her individual goals during the parenting classes and completed 6 of 11 general program goals. She did show improvement in her pre-test and post-test health and safety scores. She similarly showed improvement on her comprehensive test scores. However, despite improvement, her final scores of 43% and 58%, respectively, still demonstrated signs for concern. At the end of the program, Mother still could not identify the four different types of child abuse; could not tell if a child was being emotionally, physically, sexually abused, or neglected; could not list indicators of abuse; and could not define these terms.

{¶45} Mother also said hurtful things to other participants and broke the confidentiality of other participants outside of class.

{¶46} Mother attended 9 out of 10 scheduled supervised visitations. During supervised visits, mother was "not nurturing and affectionate" with the children and would often play with toys herself while ignoring the children. In other instances, Mother ignored the children and was more focused on talking to staff and her peers. Mother also unnecessarily scolded the children over minor details and failed to praise or become involved in the children's interests. Mother was consistently negative and found things to complain about in front of the children, which negatively affected their mood. She was also prone to use vulgar language in front of her children and other participants' children.

{¶47} Mother reported working as an in-home health aide to a disabled veteran. This environment would not be suitable for the children, and no home visit was ever conducted.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

{¶48}   Mother reported that she had broken off her relationship with Father but said that it had been hard because she missed having sexual relations with him every day. When asked how she managed this in a one-bedroom motel room, Mother responded that they had sex with a sheet covering them or that the children were asleep. Fire told Mother that this activity was unsafe and considered sexual abuse. Mother became argumentative about this and failed to see how this could be inappropriate. Fire's report stated:

> It is extremely disturbing that [Mother] did not see a problem with her behavior in the presence of her children. She knowingly placed her children at risk while satisfying her own desires and that of her partner. [Mother's] decision making and judgment are seriously flawed and until she is able to acknowledge her short-comings and take responsibility for her horrible actions, it is doubtful she will make the necessary changes to keep her children safe in the future.

{¶49}   Mother continued to express this position at a later date, saying that such activity is to be expected.

{¶50}   Mother received a certificate of non-compliance indicating that she failed to complete a minimal amount of course requirements. She did not accept responsibility for her chronic history with child protective services dating back to 2010. During her parenting class, "there were no areas of improvement demonstrated by [Mother] to confirm she was capable of **protecting her children or to independently meet all their needs. It is not in the best interest or safety of her children for [Mother] to be their primary caregiver, or even for her to provide unsupervised care**." (Emphasis in original.)

{¶51}   Sereena Creamer, clinical director at Simply Amazing Family Environment (SAFE), testified Mother was a patient at the SAFE program. Mother began the program in July 2023 and ended her participation in August 2024. The program includes parenting

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

classes, clinical counseling, and psychotherapy. The parenting course is ten weeks long. Mother completed the parenting course and attended 40 therapy sessions. Father attended the program, but the record is unclear whether he completed it or not.

{¶52} Bethany Latimer, the clinical director at Stepping Stone Community Services, testified that she is a licensed professional clinical counselor. She introduced an April 23, 2025 progress report for Mother's participation with Stepping Stone. The progress report indicated that mother had "good" attendance, "fair" adherence to her treatment goals, and "poor" performance due to continuing behaviors that "increase the likelihood of future legal problems." The treatment comment indicated that Mother "continues to come to counseling only to satisfy the requirements of Jobs and Family Services and sees no other purpose in it."

{¶53} PCJFS called Mother to testify. She said that she gave birth to six other children besides R.A., H.A., and E.A. She said that she does not have custody of any of them. Her parental rights were terminated and the oldest three were adopted. The middle three were in the custody of Mother's estranged husband.

{¶54} Mother said that she became romantically involved with Father in 2009 and gave birth to R.A., H.A., and E.A. She related that the children were removed because she and Father had an altercation. At the time, they were living at the Motel 6 in Streetsboro, Ohio. The motel accommodations were one room with two beds and one bathroom. There was a mattress on the floor for one of the children to sleep. The family had lived there starting in November 2022. The children were removed in May 2023. Prior to that the family lived in a Super 8 in Brimfield, Ohio.

{¶55} Mother said it was difficult to find permanent housing because of credit scores and a prior eviction on her record. She denied that Father's criminal history prevented her and the children from getting government assistance for housing. She said that he was no longer required to register and that she never had any concerns about him with the children.

{¶56} Mother denied using vulgar language around the children. She also denied engaging in sexual activity with the children present, saying that she was too busy taking care of the children to do so. She said she misunderstood Fire's questions.

{¶57} Mother reported having a job as an in-home caregiver for a veteran, Brian Hartman. She stated that she lived in his one-bedroom home and was contributing $500.00 per month to the rent and utilities. She reported making $4,000.00 per month. She acknowledged that her current housing situation was not appropriate for children. She said that she learned a "couple days ago" that she could move in with a friend to live with her, which would provide appropriate housing for the children.

{¶58} Mother said that Hartman had agreed to buy a house with her where the children could live, but she later learned that the house he described was never for sale. She believed Hartman was a safe person for the children to be around. Mother denied knowledge whether Hartman was a registered sex offender.

{¶59} Mother acknowledged that she did not currently have independent housing. She said that she had been looking for appropriate housing since the end of 2022 and has still not been able to secure anything.

{¶60} PCJFS called Father to testify. He said that he has five other children besides R.A., H.A., and E.A. He did not have custody of any of the other children. He

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

acknowledged that he was incarcerated for attempted Gross Sexual Imposition, which required him to register as a sex offender for 10 years. He said that he is no longer required to register.

{¶61} Father participated in therapy sessions at SAFE but was no longer doing so because of insurance co-pays. He did not participate in a substance abuse treatment program but said that he now rarely consumes marijuana. He scheduled a sex offender evaluation but missed the appointment due to car issues and never rescheduled it.

{¶62} Father was employed full-time making $2,800.00 a month. Father was still residing at the Motel 6 in Streetsboro and spending $1,600.00 to $2,000.00 a month in rent.

{¶63} Father had visited with the children but was having difficulty doing so because of car issues. He also said that his car had been stolen in the last month, but he did not file a police report because the car was registered in Mother's name. Father's driver's license has been suspended since 2021.

{¶64} Father admitted that he and Mother engaged in sexual activity in the presence of the children and said that Mother's denial of doing so in court was false. The two engaged in sexual activity in the presence of the children when they "were mostly asleep, and then we were making sure we were covered up and then, but quite frequently." This occurred on a daily or weekly basis while the children were between the ages of three and eight.

{¶65} Father said that if custody of the children returned to him, the children would have to live in the Motel 6 with him.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

{¶66} Brittany Edwards testified that she is a clinical services manager at PCJFS. She said she was assigned as a case worker to R.A., H.A., and E.A. The circumstances that led to the removal of the children involved a police report at the Motel 6 involving Mother and Father. When officers arrived at the scene, they found the room in "a bit of disarray. The living conditions were not up to par, and then there was paraphernalia of marijuana in reach of the children, I believe in the bathroom." Edwards visited the room after the children had been removed and found it still to be cluttered and unsuitable. The room had many items stacked up against the wall and covering the window with only a narrow path to walk or stand between clutter and furniture.

{¶67} Edwards created a case plan for the family. Mother never obtained stable housing suitable for the children. Father failed to complete his parenting evaluation and did not obtain suitable housing for the children.

{¶68} Edwards noted that the children seemed to be thriving in foster care and particularly noted that H.A. had become potty trained in the care of her foster parents. An additional concern was the children displaying sexualized behaviors such as touching their genitals in public settings, playing with the genitals of dogs in the home, and a report of "making out" with objects such as a doorknob. One possible explanation for this behavior was observing Mother and Father engage in sexual activity in their presence.

{¶69} Edwards did not recommend the children return to the custody of Mother or Father because the case plan objectives had not been completed. She further noted that the parents had only had supervised visitations with the children and had not reached a point to allow unsupervised visits.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

{¶70} Meghan Brown testified that she is a support staff supervisor at PCJFS and was assigned to work with R.A., H.A., and E.A. Brown said that she had attempted home visits with Mother but was unable to complete them because her employer did not permit her to enter the home. She had just learned the day before the hearing that Mother had a friend willing to provide housing.

{¶71} Brown investigated the allegations that Mother and Father had engaged in sexual activity in front of the children and substantiated sex abuse for each of the children.

{¶72} Brown had no concerns for the safety or wellbeing of the children in their foster homes and that permanent custody with PCJFS would be in the best interest of the children.

{¶73} Attorney Gazley provided a guardian ad litem ("GAL") report to the court. She had observed the children with the foster parents and observed the parents during supervised visitations.

{¶74} She verified that Mother did not deny engaging in sexual activity in the presence of the children. Further, Mother asserted that couples need to have sex and that it would be appropriate to do so in the presence of children if there were no other options.

{¶75} Attorney Gazley said that during supervised visits, Mother was often slow to respond to concerns or unsafe activities the children were engaged in and that staff needed to intervene on Mother's behalf. Mother would also respond negatively to the children's bids for attention and was not affectionate with them. Mother "often doesn't respond to what the children are talking about."

{¶76}   During supervised visits, Father did not initiate interaction with the children and "generally sits on the couch and doesn't really engage in play with the children." Attorney Gazley observed R.A. engaged in inappropriate physical contact with Father during supervised visits.

{¶77}   Attorney Gazley recommended that PCJFS be given permanent custody of the children and that they be placed in appropriate homes for adoption.

{¶78}   On October 31, 2025, the magistrate issued a Magistrate's Decision recommending permanent custody to PCJFS and terminating Mother's and Father's parental rights. The Decision summarized the testimony of each witness. The magistrate found that the children had been in the custody of PCJFS for 21 consecutive months, which satisfied the first prong of R.C. 2151.414(B)(1)(d).

{¶79}   Next, the magistrate addressed the best interests of the children pursuant to R.C. 2151.414(D). The magistrate found that Mother and Father were bonded with the children and attended visitations. As to R.A., who was nine years old at the time, the magistrate determined that her wishes to live with her father and her sisters were in conflict with the GAL, and she was appointed her own counsel to represent her interests. The magistrate determined that the children deserved secure, permanent housing with loving parents that can provide a stable home environment. The magistrate found that this could not be achieved without granting permanent custody to PCJFS because Mother and Father have been incapable of "initiating, let alone providing, permanency for the children."

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

{¶80} The magistrate found that Mother failed to complete counseling and did not comply with recommendations for treatment. She also failed to complete the Goodwill parenting program. Mother did not have appropriate housing for the children.

{¶81} The magistrate found that Father did not engage in substance abuse treatment, did not successfully complete mental health counseling, and did not complete the sex offender evaluation. Although he completed a mental health evaluation, he did not comply with the recommendations. Further, he did not have appropriate housing and was still residing in the same Motel 6.

{¶82} In determining the best interests of the children, pursuant to R.C. 2151.414(D)(1)(e), the magistrate considered the appropriate factors listed under R.C. 2151.141(E)(7) through (11). The magistrate found that R.C. 251.414(E)(7)(f) applied to the case due to Father's conviction for Gross Sexual Imposition. Further, R.C. 2151.414(E)(11) applied based on Mother and Father having previously had their parental rights terminated. The magistrate found that R.C. 2151.414(E)(8) through (10) were not applicable.

{¶83} Based on all of the factors in R.C. 2151.414(D), the magistrate found that it was in the best interests of the children to be placed in the permanent custody of PCJFS.

{¶84} The magistrate found that PCJFS had made reasonable efforts throughout the history of the case to locate and engage an appropriate and willing kinship caregiver.

{¶85} The trial court initially issued a Judgment Entry adopting the Magistrate's Decision. However, on November 5, 2025, Father timely filed Objections to the Magistrate's Decision, and on November 13, 2025, Mother timely filed Objections to the

Magistrate's Decision. Both objections argued the Magistrate's Decision was against the manifest weight of the evidence.

{¶86} On January 22, 2026, PCJFS filed a joint response to both Mother's and Father's Objections.

{¶87} On February 13, 2026, the trial court issued a judgment entry overruling the Objections to Magistrate's Decision filed by Mother and Father. The trial court noted that both parties had only made generalized objections to the Magistrate's Decision on the basis that it was against the manifest weight of the evidence and contrary to the children's best interests. The trial court said that neither objection "identifies any specific factual finding or evidence in the record that undermines the Magistrate's conclusions. Such generalized objections do not satisfy Juv.R. 40(D)(b)(ii)." Further, neither party cited to the transcript or any specific evidence in the record to support the Objections. The trial court said that despite these failings, the parties' Objections would still fail on the merits.

{¶88} First, the trial court determined the threshold finding in R.C. 2151.414(B)(1) had been satisfied because the children had been in the custody of PCJFS for more than 12 of the preceding 22 months.

{¶89} Second, the judgment entry stated that the magistrate's decision correctly applied R.C. 2151.414(D)(1) and found by clear and convincing evidence that it was in the best interest of the children to grant PCJFS permanent custody. The trial court reviewed the magistrate's findings and determined that Mother and Father had not completed their respective care plans and that "neither parent is able to provide a legally secure permanent placement for the children or has remedied the conditions that led to their removal."

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

{¶90} As to R.C. 2151.414(D)(1)(e), the trial court said that Father had previously been incarcerated and was required to register as a sex offender for Gross Sexual Imposition. Father failed to complete the sex offender evaluation. Mother minimized engaging in sexual conduct while in the presence of the children. Further, Mother and Father had previously had parental rights involuntarily terminated.

{¶91} The trial court found that the magistrate had "conducted a comprehensive and thorough evaluation of the evidence and testimony presented" and therefore overruled the Objections, adopted the Magistrate's Decision, and ordered permanent custody of the children be granted to PCJFS.

{¶92} Father timely appealed raising one assignment of error.

**Assignments of Error and Analysis**

{¶93} Father's sole assignment of error states: "The trial court committed reversible error when it granted PCJFS' motion for permanent custody and terminating Father's parental rights when granting said motion was against the manifest weight of the evidence."

{¶94} "'Permanent termination of parental rights has been described as "the family law equivalent of the death penalty."'" *In re Hoffman*, 2002-Ohio-5368, ¶ 14, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1 (6th Dist. 1991). "'The rights of a parent to his or her child, while fundamental, "are always subject to the ultimate welfare of the child . . . ."'" *In re L.M.R.*, 2017-Ohio-158, ¶ 33 (11th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974). "[T]he termination of the rights of a natural parent should occur as a last resort . . . when necessary for the welfare of the child." *Id.*

{¶95}  "R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met . . . ." *In re Z.C.*, 2023-Ohio-4703, ¶ 11. On review, an appellate court reviews a trial court's decision in permanent custody cases under a sufficiency of the evidence and/or manifest weight of the evidence standard of review "depending on the nature of the arguments that are presented by the parties." *Id*. These are distinct concepts and are "both quantitatively and qualitatively different." quoting *State v. Thompkins*, 1997-Ohio-52, paragraph two of the syllabus.

{¶96}  "[S]ufficiency is a test of adequacy." *Id.* at ¶ 23. The weight of the evidence "'is not a question of mathematics, but depends on its *effect in inducing belief.*'" (Emphasis in original) *Id.* at ¶ 24, quoting *Black's Law Dictionary* (6th Ed. 1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at ¶ 23.

{¶97}  "Nevertheless, even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.* at ¶ 14. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jur.3d, Appellate Review, § 603, at 191-192 (1978).

{¶98} R.C. 2151.414 requires that two prongs are met: "(1) that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e) is present and (2) that it is in the best interest of the child to grant permanent custody to the agency moving for custody. R.C. 2151.414(B)(1)." *In re G.C.M.G.,* 2023-Ohio-3018, ¶ 24 (11th Dist.).

{¶99} **First Prong:** Relevant to this case, R.C. 2151.414(B)(1)(d) provides:

> The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶100} Father does not dispute that PCJFS has met the first prong because the children were in temporary custody for more than 12 out of a consecutive 22-month period. However, he argues the trial court erred in determining that granting PCJFS permanent custody was in the best interests of the children.

{¶101} **Second Prong:** If at least one of the circumstances in R.C. 2151.414(B)(1)(a) through (e) exists, the trial court must then determine by clear and convincing evidence that granting permanent custody is in the child's best interests.

{¶102} In determining the best interest of the child, R.C. 2151.414(D)(1) requires that the trial court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶103} "Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of '"all relevant [best interest] factors,"' as well as the 'five enumerated statutory factors.'" *In re B.R.H.*, 2025-Ohio-5181, ¶ 38 (11th Dist.) quoting *In re C.F.*, 2007-Ohio-1104, ¶ 57, quoting R.C. 2151.414(D).

{¶104} R.C. 2151.414 does not require a court to give any of the best interest factors "greater weight or heightened significance." *In re C.F.* at ¶ 57. When making its best interest determination, a trial court must consider the totality of the circumstances.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

*In re B.R.H.* at ¶ 38. "In general, '[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security.'" *Id.*, quoting *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.).

{¶105} In this case, the trial court made the following findings:

{¶106} **R.C. 2151.414(D)(1)(a):** the children were bonded with their respective foster parents. Although the court also determined that the children were bonded with Mother and Father, there were numerous concerns about Mother and Father's ability to parent that were noted during supervised visitation. Those concerns included Mother's negativity with the children, inattention, and focus on other adults, rather than the children. Father also demonstrated a lack of interaction and engagement with the children.

{¶107} **R.C. 2151.414(D)(1)(b):** R.A. expressed a desire to live with Father and her sisters. H.A. and E.A. were unable to express their wishes regarding permanent custody. Attorney Gazley, as the GAL, recommended that it would be in the best interest of the children to be placed in the permanent custody of PCJFS.

{¶108} **R.C. 2151.414(D)(1)(c):** the children had been in the custody of PCJFS from May 25, 2023, through the conclusion of the permanent custody hearing on October 3, 2025.

{¶109} **R.C. 2151.414(D)(1)(d):** Mother and Father were unable to provide stable appropriate housing for the children 28 months after the children had been removed from their custody. Although Mother and Father attended supervised visitations, they did not complete case plan goals necessary to have unsupervised time with the children.

{¶110} Mother attended the Goodwill parenting program but earned a certificate of non-compliance. Mother did not complete mental health counseling. Dr. Thomas testified

that reunification without compliance with the Lighthouse treatment would place the children at significant risk of harm.

{¶111} Finally, although Mother denied this, the evidence strongly supports the conclusion that Mother and Father engaged in sexual activity in the presence of the children. Making this more troubling is that Mother became argumentative about whether such action was appropriate. PCJFS investigated this issue and substantiated sexual abuse.

{¶112} A permanent grant of custody to PCJFS would provide secure permanent placement for the children. The children were in supportive environments with their foster parents and thriving. R.A. was excelling in school and engaged in extracurricular activities. Her foster parent was helping her to act as a sibling rather than in a parental role to her sisters. H.A. was late to potty train and non-communicative when she entered foster care and was working to overcome those difficulties in a supportive home environment. She was also receiving occupational and physical therapies. E.A. was beginning to read and involved in extracurricular activities and bonded to her foster family. All three foster families made time for the children to socialize with each other and planned on maintaining sibling contact. All three foster parents wished to adopt their respective foster children.

{¶113} **R.C. 2151.414(D)(1)(e):** The following factors applied in relation to the parents and the children: Father's conviction for attempted Gross Sexual Imposition (R.C. 2151.414(E)(7)(f)), and Mother and Father had previously had their parental rights involuntarily terminated to with respect to a sibling and failed to provide evidence that they

could provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child (R.C. 2151.414(E)(11)).

{¶114} We conclude that each of these findings were supported by the evidence presented at trial. The trial court's conclusion that it was in the best interest of the children to be placed in the permanent custody of PCJFS was not against the manifest weight of the evidence.

{¶115} Accordingly, Father's sole assignment of error is without merit.

{¶116} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.


EUGENE A. LUCCI, J.,

ROBERT J. PATTON, J.,

concur.

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, Appellant's assignment of error is without merit.  It is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas, Juvenile Division, is affirmed.

Costs to be taxed against Appellant.


_____
JUDGE JOHN J. EKLUND


_____
JUDGE EUGENE A. LUCCI,
concurs


_____
JUDGE ROBERT J. PATTON,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case Nos. 2026-P-0017, 2026-P-0018, 2026-P-0019